JOAQUIM ANTONES ET AL., TRUSTEES OF THE CHURCH OF THE
HOLY CONCEPTION, IN THE CITY OF MOBILE, *vs.* THE HEIRS
OF DON MIGUEL ESLAVA.

1. A plaintiff in equity, must recover upon the strength of his own title, and not upon the weakness of that of the defendant.

2. A deed, conveying lots of land in the city of Mobile, during the period the Spanish government was entitled to, and exercised dominion over it,—" to His Catholic Majesty, for the purpose of building thereon a parochial church and dwelling house, for the officiating priest," where the purchase money was paid from the *Royal Chests*,—does not constitute His Catholic Majesty a trustee for the *church*, or transfer to *it*, in equity, a title to the lots.

3. Whatever might be the extent of the papal authority in Old Spain, the grants of Popes *Alexander VI* and *Julius II*, to Ferdinand, made the Spanish monarchs, in effect, the head of the Catholic church, in their American possessions.

4. *Semble.* The acts of the Intendant of West Florida, during the time the Spanish Government was the proprietor of the country, which have the appearance of regularity, were *prima facie* legal.

5. It is a well established principle, both in the civil and common law, that property may be dedicated to public or religious uses —and the dedication may be sustained, though there is no certain grantee,—it may exist in the public, and be limited only by the wants of the community at large.

6. So, the dedication of property may be for a limited period, or during the pleasure of the party dedicating it. And it here clearly appears, that it was during *the sovereign pleasure of the King of Spain*, that the lots in question were held for religious purposes.

Error to the Circuit court of Mobile, exercising chancery jurisdiction.

On the thirteenth of February, eighteen hundred and twenty-seven, the plaintiffs in error exhibited their bill on the equity side of the Circuit court of Mobile county, against the defendants, asserting title on behalf of the church, to several lots in the city of Mobile.

The plaintiffs allege, that as early as March, seventeen hundred and three, "a parish church was erected at Mobile, and a pastor regularly inducted therein, agreeably to the laws of the French Government, and the canons of the Holy Roman Catholic church; which church has continued, under successive changes of government, until the filing of their bill. This allegation, it is said by the plaintiffs, can be shown by authentic documents and registers in their possession, as also by the charter granted by the Company of the Indies, which orders the erection of a church and parsonage-house, to possess all the incidents of a parish church and parsonage, under the then existing laws of France.

The plaintiffs further state, that in the year seventeen hundred and ninety-two, a deed was made by the then proprietor, conveying the premises in dispute to His Catholic Majesty, the King of Spain, in trust for the church at Mobile. A translation of this *deed* is set out at large in the bill, and exhibited with the defendants' answer—so far as it is material to recite it, it is in these words: "Which said lots we sell to His Catholic Majesty, for the purpose of building thereon a parochial church, and dwelling house for the officiating priest, together with all their rights of egress and ingress, and privileges of every kind whatsoever, which of right appertain thereto, free from all incumbrance, as may appear from the cer-

Antones et al. *vs.* Heirs of Eslava.

tificate of the Recorder of Mortgages, for the consideration of two hundred dollars, the receipt whereof, in cash, from the Royal chests, we do hereby acknowledge, and with which we are satisfied, hereby renouncing the proof thereof, the laws of delivery, the exception of the laws of the *non enumerata pecunia.*

By means whereof, we give up and relinquish all the right, title, claim and demand whatsoever, which we and the said co-heirs had and held to the said property, and which we renounce, yield and transfer, to His Catholic Majesty, for the purpose aforesaid, in order that he may possess, sell, or alienate them, at his sovereign pleasure, by virtue of this deed, which we execute in sign of actual delivery, whereby it may be seen, that he has acquired the possession thereof, without the necessity of any other proof, from which we relieve him."

The bill then proceeds as follows: "In pursuance of the instrument aforesaid, the church and parsonage-house have been erected, and peaceable and quiet possession of the same were enjoyed by the church, being the same property on which the Catholic church now stands, and the United States Hotel, corner of Royal and Conti streets, until about the sixth of June, eighteen hundred and seven, or some time after that, when one Don Miguel Eslava, pretending to have a right of and to the property described above, entered into the possession of the same, and has kept possession of part of said property, viz., that part on which the parsonage-house was erected, (now the United States Hotel,) and a portion of the lot whereon the church was, and still is, erected, west of the same, unto the limits prescribed by the conveyance aforesaid."

9 P                    67

The bill then charges, that the possession of Don Miguel Eslava continued until his death, and that since that event, the premises have been, and still are, occupied by the defendants, his heirs.

The plaintiffs further represent, by their bill, that "in consideration of the titles granted by the Catholic church in both the Indies, (of which Louisiana and the Floridas formed a part,) to the King of Spain, he obligated himself to provide for the churches, to found them, when necessary, and to maintain the clergy." The bill then prays, that the premises may be decreed to belong to the plaintiffs, and that the defendants be compelled to account to them for the rents and profits.

The defendants, in their answer, object, by way of *demurrer* to the bill, that the complainants have not stated how they were appointed trustees of the church of the *Holy Conception*, or how they became entitled to sue for the premises and rents that they seek to recover. And neither denying or admitting the period of the erection of a parish church at Mobile, and the induction of a pastor therein, as stated in the bill, they require the plaintiffs to prove the same.

The defendants deny that the charter granted by the Company of the Indies, ordered the erection, at that point, of a parish church with a parsonage-house, to enjoy and possess all the incidents appertaining to a parish and parsonage-house, under the then existing laws of France. They insist, that that company was entirely of Spanish origin and institution, and that consequently, its actings and doings, were not approved by the King of France.

The defendants further state, "that they have under-

Antones et al. *vs.* Heirs of Eslava.

stood, and believe, that a Catholic church was erected at Mobile, on, or about the —— day of ———, by the King of France, whilst under his dominion, but not on the same lands now claimed by the said complainants of these defendants, but in a different part of the city of Mobile." They deny that the church and establishment, as alleged by the plaintiffs, continued under the successive governments, until the filing of their bill.

They admit the execution of a deed of conveyance in seventeen hundred and ninety-two, but that the translation accompanying the plaintiffs' bill is correct, they explicitly deny, yet exhibit with their answer, a translation, not materially variant, and insist that the legal effect thereof, under the Spanish government, was not to convey the lots embraced by it to the King of Spain, in trust for the Catholic church ; but, on the contrary, they aver, that according to the laws, usages and customs of the Spanish government, in force at the time of the execution of the *deed*, the title to the lots vested in the King, for the purpose of building thereon a parochial church, and dwelling house for the officiating priest ; and *also that he might possess, sell or alienate them, at his sovereign pleasure.*

The defendants further answer, that they have been informed, and believe, that at the time of the execution of the *deed*, the Spanish law then in force, authorised any one, with the permission of the bishop, to erect a church ; that he who built a new church, was bound to give to it certain *landed property*, out of the rent of which, the priest was to live, &c.

That if the King of Spain, at the time he purchased

the premises in dispute, through his agent, contemplated the erection thereon of a church, and house for the residence of the officiating priest, yet he never divested himself of the title thereto, in favor of the church, by making any manner of donation thereof, either with or without the assent of a bishop; but to the contrary thereof, the the title of the house, whilst the residence of the officiating priest, as well as the grounds and appertenances, continued and remained in him, (the King of Spain); and on the first day of June, eighteen hundred and seven, were sold at public auction, to the highest bidder, for cash, by order of the King, through the Intendant, as his representative. That that sale was made at the instance, and with the approbation of the curate, who officiated as the regularly appointed priest of the Catholic church at Mobile; and Don Miguel Eslava, the ancestor of the defendants, being the highest bidder, became the purchaser of the premises, at eight hundred and five dollars, was put into the possession of the same by order of the Intendant, and continued the occupancy thereof until his death, an event which occurred in December, eighteen hundred and twenty-three, when the possession devolved, by law, upon the defendants, as his heirs.

The defendants further answer, that their ancestor, —pursuant to the several acts of Congress, in relation to land claims south of the thirty-first degree of north latitude, and east of the island of New Orleans,—presented his claim to the property sued for, to the proper officers of the government, and that the same has been duly confirmed. But they deny that the plaintiffs, or any other person, assuming to represent the interest of the Catholic

church at Mobile, did, at any time, assert any claim to the premises in dispute, before any person appointed on the part of the United States, to adjust the same.

On the hearing, the plaintiffs gave in evidence, a translation of the original deed of seventeen hundred and ninety-two, a copy of which accompanies their bill. They also proved by *Bishop Portier*, the Catholic bishop of Mobile, " that certain books, being registers of births and marriages, kept by the rectors of the church, purporting to be a register of marriages of the parochial church of the Most Holy Conception of the city of Mobile, from the year seventeen hundred and eighty-two, till the year eighteen hundred and thirty-eight; also the book of registry of births, in the same church, from the year seventeen hundred and eighty-one, till the year eighteen hundred and thirty-eight; and that he found them in the archives of the church, eleven years ago, when he became connected with it, and that he is the proper *custodian* of the same. These books were produced and examined."

· In order to relieve the plaintiffs from making proof to the point, it was admitted by the defendants' counsel, that it was shown by the evidence for the defendants, that the "church and parsons house were built upon the ground in controversy, and occupied as such, from a period shortly after the deed to the King, in seventeen hundred and ninety-two, until the sale thereof by the Intendant."

The plaintiffs also gave in evidence, *a copy* of certain "Articles of Government and Constitution of the congregation of the Roman Catholic church of the Holy Concep-

tion in the city of Mobile, made and entered into, this twenty-first day of November, in the year of our Lord, one thousand eight hundred and twenty-two." These articles were certified on the sixteenth day of January, A. D. eighteen hundred and thirty-eight, by the clerk of the County court of Mobile county, to have been regularly recorded in his office—but when they were recorded, is no where shown by the record. They provide for the annual appointment of five trustees, for the management of the property and temporal interests of the church, and designate five individuals, who are to act as trustees, until superseded by an election—neither one of whom corresponds in name, to either of the plaintiffs in this action. The record does not inform us whether, between the time of the formation of the articles of government, &c. and the commencement of this suit, an election of trustees was made.

On the part of the defendants, the exhibits accompanying their answer, were given in evidence, viz. a translation of the deed of seventeen hundred and ninety-two, and the proceedings in regard to the sale of the property in question, under the authority of the Intendant of the province of West Florida—the purchase and payment for, and on account of, Don Miguel Eslava—the order for, and delivery of, possession to him. These documents show that an investigation was ordered by the Intendant, with a view to ascertain the expediency of a sale, and that the sale was ordered, upon the enquiry having determined the measure to be proper; they further show, that these proceedings were had at the instance, and with the approbation of, the then officiating curate.

Antones et al. *vs.* Heirs of Eslava.

It was also proved, by a deposition, taken at the instance of the defendants, that the Intendant of the province, was vested with the authority of disposing of all crown lands, within his jurisdiction. And further, that the powers and privileges of the church, "were by no means so extensive in the province, as in other parts of the Spanish dominions. Here, it levied no titles—here, it exercised no inquisitorial powers—here, its ministers were made stipendiaries of the crown, from whose treasury they received an annual salary, and had, besides that, no source of income, except their fees on marriages, christenings, and so forth. I add, moreover, (says the witness,) that the sale of the property in question, took place in Pensacola, during my residence there, a short time before I removed to Mobile; that it was public and notorious, and no one, to my knowledge, ever questioned the authority by which it was made, and that thereafter, and during the whole time that the Spanish government exercised authority here, a house was rented by the crown, for the residence of the curates, as I have understood from the curates themselves, from the officers in charge of the treasury department, and from some of the owners of those houses."

It is needless to notice, any farther, the evidence adduced at the hearing, for quite enough of the record has been already cited, to discover the pertinency of the opinion of the court.

The judge of the Circuit court rendered a decree dismissing the complainants' bill, at their costs—from which they have prosecuted a writ of error to this court.

Antones et al. *vs*. Heirs of Eslava.

*J. A. Campbell*, for plaintiffs in error.
*Stewart*, contra.

COLLIER, C. J.—The plaintiffs admit, that they do not sue as a corporation, under the *act* "to incorporate and empower religious societies of every denomination to hold real estate," passed in 1819. It seemed to be conceded in the argument, that the powers conferred upon the corporation, under that statute, does not invest it, *as such*, with the right to all property, of which the Catholic church at Mobile may have been the proprietor under the Spanish government. And the only purpose proposed by the introduction of the recorded articles of government, and the *names of the trustees*, was to show that the church of the Holy Conception had a "continuous existence."

The plaintiffs, then, having disclaimed a corporate existence, we are to enquire whether the allegations in their bill, and the proof upon the record, show that their individual interest in the subject matter of the controversy, is such as to entitle them to be heard.

In the commencement of their bill, after setting forth their names, they style themselves "trustees of the church of the Holy Conception in the city of Mobile." How they became trustees, and what their powers, we are not informed. It is not admitted, in the answer, that the plaintiffs are entitled to the character they assume, but, on the contrary, the defendants protest against the assumption as unauthorised, while they insist, that the plaintiffs should have shown how they became trustees, or by what authority they litigate the several matters stated

Antones et al. vs. Heirs of Eslava.

in their bill. The defendants, by questioning the sufficiency of the bill in this particular, do not relieve the plaintiffs from the necessity of showing their interest in the property in controversy. It is immaterial what may be the rights of the church, they cannot be adjudicated at the instance of persons who discover no interest in their adjustment. It is not enough for a plaintiff, in an ejectment or trespass to try titles, to prove that the defendant had no title, but that it is vested in a third person, disconnected with either party—the plaintiff must go farther, and trace a title directly to himself. As a question of morals, the party in possession of property belonging to another, has as good right to retain it, as any one else whose title is no better; and if it were allowable, to dispossess him at the suit of any one who might sue, without reference to the question of right, litigation the most vexatious would ensue: the successful plaintiff might, in turn, be ejected by one having no better title than himself, and the courts of judicature be employed in adjudging controversies, profitless in themselves, and inconclusive of rights.

It cannot have been supposed, that the want of a *direct denial* by the defendants, of the plaintiffs' interest in the controversy, dispensed with the necessity of proof to that point by the latter. True, it has been held, that where a matter is alleged by the bill, to be peculiarly within the knowledge of the defendant, and he neglects to answer the allegation, his silence shall be construed into an admission of its truth—(Thorington vs. Carson et al. 1 Porter's R. 257); yet the present question is entirely dissimilar—the defendants are not charged, nor

Antones et al. *vs.* Heirs of Eslava.

can they be presumed to be peculiarly conversant of the plaintiffs' character, but the plaintiffs must know whether they are entitled to sue, or, at least, must have the proof within their own reach, by which that question may be determined. It is not only necessary for the plaintiffs to show that the defendants are answerable to the cause of complaint alleged against them, but they must also prove, that they are answerable to them.

But it is argued for the plaintiffs, that it is sufficiently shown, that they are members of the Catholic church, at Mobile, and, as such, may, in virtue of a community of interest in the property of the church, sue on behalf of themselves, and others. Without controverting the conclusion of the argument, we think the premises are not sustained by the record. The description of themselves as trustees, we have seen, does not dispense with proof of the fact. In looking over the signatures of the male members of the church, to the articles of government, we find two or three names, corresponding with the names of as many of the plaintiffs; yet, if that paper were to be regarded as evidence, for all purposes, it would not prove that any of the plaintiffs were members of the church of the "Holy Conception;" for it often happens, that different persons bear the same name, so as to make it unsafe to infer an identity of the person, from an identity of name. There can, indeed, be no necessity for resorting to such proof to establish the plaintiffs' membership—if it really existed, it was susceptible of the clearest demonstration, either from the knowledge of witnesses, or else from the church registry, connected with such testimony.

Antones et al. *vs.* Heirs of Eslava.

The case of Beatty *&* Ritchie vs. Kurtz et al. (2 Peters, 566,) on the point we are considering, is very dissimilar from the present. The court there say, that "the only difficulty is, whether the plaintiffs have shown in themselves, a sufficient authority, since it is not evidenced by any formal vote or writing. If it were necessary to decide the case on this point, we should incline to think, that under all the circumstances, it might be fairly presumed. But it is not necessary to decide the case on this point; because, we think it one of those cases, in which certain persons, belonging to a voluntary society, and having a common interest, may sue in behalf of themselves, and others, having the like interest, as part of the same society; for purposes common to all, and beneficial to all."

In that case, it was shown by the evidence, that the Lutherans, in Georgetown, (the place where the property in dispute was situated,) had been in possession of the lot, though they never had been incorporated: that the congregation "consisted of a voluntary society, acting in its general arrangement, by committees and trustees, chosen from time to time, by the Lutherans belonging to it. There do not appear to have been any formal records kept of their proceedings; and there have been periods of considerable intermission in their appointment and action. There is no other proof that the plaintiffs are a committee of the congregation, than what arises from the statement of witnesses, that they were so chosen by a meeting of Lutherans, and that their appointment has always been acquiesced in by the Lutherans, and they have assumed to act for them, without any question

of their authority : that they are themselves Lutherans, living in Georgetown, and forming a part of the voluntary society, is not disputed." These circumstances, we think, very clearly show the interest of the persons undertaking to represent the church—their appointment as trustees, and the recognition of their acts, by the Lutherans. They court were, then, right, in saying, if it were necessary, they would be inclined to presume the authority of the "plaintiffs" to sue. But, in the case at bar, there is no proof, either direct or indirect, that the plaintiffs are trustees of the Catholic church at Mobile, that they are members of the same, or have an interest in the decision of the matters stated in their bill; so that the decree of the Circuit court, for the defect of proof in this particular, would seem to us to be defensible in law.

We might here close this opinion, but as it may be more satisfactory to the parties, to learn our views of the law upon the substantial merits of the case, we will examine the pretensions of the plaintffs still further; and we will enquire,

First—Had the Catholic church at Mobile, in eighteen hundred and seven, or at any time previously, an equitable title to the lots conveyed by the deed of seventeen hundred and ninety-two, to the King of Spain?

Second—Was there such a dedication of the lots to the use of the church, as to invalidate the sale made by the Intendant of the province, in eighteen hundred and seven?

1. We propose to consider this question, in reference to the principles which govern analagous cases in equity, as these are not materially variant, *so far as the interest*

*of the church is concerned,* from the rules of the civil law, in force, to some extent, at Mobile, during the time the Spanish authorities exercised the government of the province.

From the deed, we learn that the King of Spain, through the Intendant, &c. of the province of Louisiana, purchased the property embraced by it, and paid for the same "in cash, from the Royal chests," and received a conveyance therefor, "for the purpose of building thereon a parochial church, and dwelling house for the officiating priest." If the King was bound, in moral duty, to have *thus provided* for the church, he might, perhaps, have been regarded as a trustee in the purchase; but none of the citations from the *Partidas,* which have been made by the plaintiffs' counsel, or the evidence in the record, show any such duty to have been rested upon the crown of Spain.

Courts of equity have exclusive jurisdiction over matters of *trust;* and will compel their performance, if a trustee is perverse or faithless—(2 Story's Eq. 228, 229.) Trusts are either express or implied: the former are created by the direct and positive acts of the parties, by writing, or deed, or will. The language employed, in such cases, need not point out the very nature, character and limitations of the trust, in direct terms, *ipsis verbis;* if the intention to create it, can be fairly collected from the face of the instrument, it is sufficient; and the trust can be drawn, as it were, *ex visceribus verborum.*

The words used in the deed, would indicate that it was contemplated by the Intendant, at the time of the purchase, to appropriate the lots to the purposes of the

church, yet there is nothing in the deed, which would oblige him thus to use them; and there is no authority for implying a covenant to hold them for the benefit of the church: such a covenant might well be implied, if the purchase had been made with the funds of the church —but clearly not, where the "Royal chests," alone, had contributed the means of payment. This conclusion results from certain analagous rules, which apply to implied trusts—thus, if a man buys land in the name of another, and pays the consideration money, the land will generally be held by the grantee, in trust for the person who paid the consideration—(2 Story's Eq. 443, 444, 445.) There are, however, exceptions to this rule; as, if a parent purchase in the name of a son, the purchase will *prima facie* be presumed to have been intended as an advancement, so as to rebut the presumption of a resulting trust for the parent—(2 Story's Eq. 445, 446.)

So, also, if an agent or trustee, authorised to purchase lands for another, should purchase lands with the money of his principal, or *cestui que trust*, and take a conveyance, in his own name, a court of equity would, in such a case, deem the property to be held as a resulting trust, for the person beneficially entitled—(2 Story's Eq. 456, 457.)

Independent, however, of the absence of words creating an express trust, or authorising its implication, the deed itself negatives the idea, that it was intended to create a trust in favor of the church. The lots were conveyed to His Catholic Majesty, with the express stipulation, that he might "*possess, sell, or alienate them, at his sovereign pleasure.*" How could this be done, if

Antones et al. *vs.* Heirs of Eslava.

immediately upon the consummation of the purchase, the King became a *mere trustee*, and the church the beneficiary ?

But, if the pretensions of the plaintiffs were sustained by the laws which were applicable to the church in Old Spain, they could not be recognised here. The control accorded to the Spanish monarchs, over the clergy and church in America, are utterly opposed to the claim set up by the plaintiffs. Notwithstanding the veneration which the Spaniards have manifested for the *Holy See*, the vigilant and jealous policy of Ferdinand, early prompted him to take precautions against the introduction of the papal dominion in the New World. For that purpose, he obtained from Alexander VI, a grant to the crown, of the tithes, in all the newly discovered countries, on condition that he would provide for the religious instruction of the natives. Soon after, Julius II conferred on him, and his successors, the right of patronage, and the absolute disposal of all ecclesiastical benefices there. The Pontiffs, unacquainted with the value of what Ferdinand demanded, bestowed these donations with an inconsiderate liberality, which their successors have often lamented, and wished to re-call. In consequence of those grants, the Spanish monarchs became, in effect, the heads of the Catholic church, in their American possessions—In them, the administration of its revenues was vested—their nomination of persons to supply vacant benefices, was instantly supplied by the Pope—thus, in all Spanish America, authority, of every species, centred in the crown—there, no collision was known between spiritual and temporal jurisdiction: the King is the only

Antones et al. *vs.* Heirs of Eslava.

superior—his name was alone heard of, without looking to a dependence upon any foreign power. Papal bulls were not recognised as of any force in America, until they had been examined and approved of, by the Royal Council of the Indies; and if any bull was surreptitiously introduced and circulated in America, without obtaining that approbation, ecclesiastics were required not only to prevent it from taking effect, but to seize all the copies of it, and transmit them to the Council of the Indies —(Robinson's Am. 360, 362; Prescott's Ferdinand and Isabella, 492, 493.) Thus limited was the papal jurisdiction in the Spanish possessions in America.

If it were material, we would presume, that the Intendant of the province of West Florida possessed the power necessary to have authorised the enquiry and decree, for a sale of the parsonage and church lots, on the ground, that he was a public officer of his government, and the act was seemingly regular—(United States vs. Arredondo and others, 6 Peters' Rep. 727, 728; New Orleans vs. The U. States, 10 Peters' Rep. 727.)

2. That property may be dedicated to public or religious uses, is well established, both in the civil and common law—(The Town of Pawlet vs. Clark, 9 Cranch, 292; Beatty & Ritchie vs. Kurtz et al. 2 Peters, 583; City of Cincinnati vs. The Lessee of White, 6 Peters, 435; New Orleans vs. The United States, 10 Peters, 712; Barclay et al. vs. Howell's Lessee, 6 Peters, 498.) In order to sustain a dedication of property, it is not necessary that there should be a certain grantee, to whose use it is made, nor is it essential that the right of use should be vested in a corporate body; it may exist in the public,

Antones et al. *vs.* Heirs of Eslava.

and have no other limitations than the wants of the community at large. In the case of urban property, the dedication of ground to the use of streets, commons, and for charitable and religious purposes, may be shown by a plat, or plan of survey, by maps, and by use appropriate to the object for which it was originally destined. In the case before us, it cannot be pretended, that these *in dicia* combine to divest the title of the King of Spain, and to vest the right of use in the church. The plaintiffs insist, that the dedication is sufficiently shown by the erection of the church and parson's house on the lots, and their occupation, for thirteen or fourteen years. The law does not prescribe an exact period, beyond which the original proprietor shall not withdraw property from a religious or charitable use, to which he has destined it, or after which the presumption in favor of its dedication shall be conclusive. True, the facts in the record, unexplained by other proof, afford a presumption, that the lots in dispute had been appropriated to the purposes of religion, yet they are entirely outweighed by the testimony on the part of the defendants. The petition of the curate to the Intendant of the province, asking that the parsonage be repaired, or if that be judged inexpedient, that it be sold; the evidence, in the deposition of the defendants' witness, that the crown rented a house for the residence of the curate, &c.; the Intendant's *decree*, made upon a formal examination, directing a sale; the acquiescence, at the time, and for near twenty years thereafter, in the regularity of the decree, and the proceedings under it,—all serve to show, that the property

9 P　　　　69

was only dedicated to the uses of the church, during *the sovereign pleasure of the King*.

The case of Beatty & Ritchie vs. Kurtz et al. (2 Peters' Rep. 566,) is unlike the present. In that case, it appeared that the lot had been marked in the original plan of an addition to Georgetown, "for the Lutheran church," and been used by the German Lutherans of the town, from a period immediately after its dedication, and upwards of fifty years, as a place of burial; that they erected on it a school-house, which was occasionally used as a church, but which had gone to decay, and no church had been since re-built. The Lutherans, however, still exercised acts of ownership, for the protection of the property, and contemplated, when practicable, the erection of a church thereupon. The original proprietor always acquiesced in their possession, and after his death, his son and heir declared his readiness to perfect their title. Here was a clear case of dedication, as shown by a "map," prepared before the sale of the lots, and long and uninterrupted use, coupled with the silent, as well as declared acquiescence of all persons interested—which evidences do not exist in the present case. And in the cases cited from 6 and 10 Peters, the evidence to show a dedication is not less satisfactory, than in the case of the *Lutheran church*.

Other questions, interesting in themselves, have been discussed at the bar, but their decision is rendered unnecessary, by the view already taken of the case—and our conclusion is, that the decree of the Circuit court must be affirmed.