WILLIAM C. BLAIR, Appellant, vs. JOHN M. ODIN, Catholic Bishop of Texas, Appellee — Appeal from Victoria County.

In Spanish America the right of church property was in the crown of Spain, as the head of both temporal and spiritual jurisdiction; and this right, after the Mexican revolution, vested in the government of Mexico as successor to the former sovereign power.

The Catholic church, at the period of the Texan revolution, held no real estate by perfect title.   It only enjoyed and held the usufruct interest in such lands as it possessed.

By her successful revolution the republic of Texas became possessed of the right and title to all the land or public domain then belonging to the government of Mexico by as full and perfect title as was vested in that government or in the government of Coahuila and Texas.

The usufruct interest or tenure possessed by the church in and to lands in Texas was not dissolved or rendered void by the mere act of a change of sovereignty; and until some affirmative act on the part of the new government to resume such interest, the tenant in actual possession, susceptible of definite proof, will have rights of a character to be protected in our courts.

To sustain an action for property, as a dedication to religious uses, the plaintiff must show a legal title; or he must show a possession of the use, and a deprivation thereof.   [15 Tex. 118.]

The act of congress of 13th January, 1841, in granting to the Roman Catholic church, the church of San Antonio, Goliad, and Victoria, had reference to the edifices themselves; and does not include a lot upon which there was no church edifice, and which was not connected with any such edifice.

The material facts of this case are stated in the opinion of the court.

ROBINSON and CUNNINGHAM for appellant.

The principles which govern in the trial of ejectment are applicable in this action.

1st. There is no evidence to show that the plaintiff, or the Mexican Catholic church, ever had possession of the premises in question.   He must then show a good and indefeasible title from either the Mexican or Texan government.

2d.  He cannot claim under the Texan government unless he claims under the private act of 1841, granting him certain property as trustee, etc.   The premises in suit are not granted by that act, because the church in Victoria *only* is granted, and no other lot or lots, except that on which the church stands.   The Catholic church then, now, and ever since 1826, was on another lot east of Market Square.

3d. The plaintiff claims entirely under the colonization law of Coahuila and Texas, and the instructions to commissioner [in laws of Coah. and Texas, 72], and a survey made in pursuance of said instructions. Does this constitute a title in the plaintiff, Odin? It does not.

1st. Because this is merely a general *law*, made to operate generally, and was repealed before the act of donation was complete. [See Laws of Coah. and Texas, 193.] There are no words of grant, no possession, no grantee mentioned. Such a grant to a citizen would not be good.

2d. It was not the intention to give dominion or title to the church, no more than they intended to pass the title of the municipal square to the municipal authorities, or of the plaza to the military. These lots, or blocks, were all alike reserved to government, for government purposes.

3d. But more; a grant to the church, or congregation, or bishop, or to any other corporation or brotherhood, would have been illegal. [See general colonization law prohibiting the states from granting land in mortmain; and see laws of Coah. and Texas, p. 193, art. 32.]

These provisions relating to mortmain *(mortuos manos)* must be construed in accordance with the Spanish laws of same subject. [See 2 White's Compilation, p. 141, secs. 20, 21; see, also, 2 White's Comp. 183, sec. 14, which explains the meaning of the term.] This act of the Spanish cortes is recognized and acknowledged as law by the legislature of Coahuila and Texas, page 240. [See, also, Tomlin's Law Dictionary, title Mortmain.]

4th. The plaintiff, Odin, cannot claim under the Mexican Catholic church, or congregation, or bishop, or pastor.

If the title to this land passed, or the usufruct, at all, it must have passed to one of these. If it passed to the bishop of Monterey, he is still the owner. If to the cura of Victoria under the Mexican establishment, there is no successor, for there has been no appointment since the war. If to the church or congregation, still he is not authorized to sue as their trustee, except by act of 1841, for certain specific property. No ap-

pointment by the pope could give him the right in Mexico or Texas. [See Antoines *et al. vs.* Heirs of Esclava, 9 Porter's Ala. Reports, 527 to 536; also, Methodist Chapel Corporation *vs.* Kenick, 25 vol. Maine Rep. pp. 356–7–8.]

5th. If there ever was a right to the dominion or the use or usufruct in the Mexican church, or any of its officers, it was in the cura, and was held by him at the will of the government of Coahuila and Texas. He was a kind of political corporation for the purposes of government, and the institution liable to be abolished at any time.

The abolition of the order of Jesuits, and the order for the sale of the lands of missions by government, is an example of the exercise of this power, and the principle is fully recognized in common law countries.

By the Texas revolution, all the rights of the Mexican government passed *ipso facto* into the Texas government; and that government granted these lands to the corporation, as well as the use of all the four leagues, for certain purposes. [See Laws of Texas, 1840, last page.]

WEBB for appellee.

By the 34th article of the colonization law of 1825 [p. 21], it is provided that towns "shall be founded on such sites as the executive, or person commissioned by him for that purpose, shall judge most appropriate; and four square leagues shall be designated for each." And by the 13th article of the commissioner's instructions [p. 72], it is declared that "the block fronting the principal (or constitutional) square on the east side shall be destined for a church, curate's dwelling, and other ecclesiastical edifices."

The record shows that the town of Victoria was laid out by the lawfully appointed and authorized commissioner for that purpose, in conformity with law; and the 13th article of the instructions shows that the square in controversy was set apart and dedicated by law to the use of the Roman Catholic church. [6 Peters, 431, 437.]

A dedication for charitable or pious purposes does not re-

quire that there should be a grantee in existence capable of taking the fee, even if that objection could apply to this case. But it cannot; the plaintiff sues as the Catholic bishop and chief pastor of the Roman Catholic church in Texas, as a corporation sole, holding the property for the use of the church. [2 Peters' R. 566, 578, and on 582–3; 6 Peters' R. 431, 435; 3 Cond. R. 254, 257.]

The Roman Catholic church being the only recognized and established church in the country, anterior to the revolution, the dedication was made exclusively for the benefit of that church; and the fee vested in the chief pastor *jure ecclesia* and was not divested or affected by the revolution. [3 Cond. R. 254, Col. Laws; Constitution C. and T. art. 9, Prelim. Prov. p. 314; Const. Mexico, 1 White, 375, art. 4.]

If, however, there was any doubt upon this subject, that doubt is removed by an act of congress, approved January 13, 1841, confirming this very property to the chief pastor of the Catholic church. [5 vol. Laws, p. 28; 4 Peters, 502; 3 Cond. R. 254, 261.]

The patent of the four leagues of land to the corporation of Victoria issued in December, 1841, nearly twelve months after the right of the Catholic church was confirmed by a legislative enactment, cannot affect that right.

The objection that the lands could not be held in mortmain is answered by saying, that the very power which declares the inhibition afterwards makes the dedication and grant. The law directing the reservation of the square for the use of the church is a plain recognition by the law-making power of the capacity to take and hold for the purposes designed. [4 Peters, 562.]

Mr. Justice LIPSCOMB delivered the opinion of the court.

This suit was brought by Bishop Odin, as the head of the Roman Catholic church in Texas, to recover a lot or square of ground in the town of Victoria. It appears, from the proof, and the facts admitted by counsel, that the town of Victoria was laid out and surveyed in 1832, as a four league town, in De Leon's colony. That the lot in controversy was designated

on the map of the town as the church square; and it was ad-· mitted that, at that time, it was designed for a church, curate's dwelling, and other ecclesiastical edifices; that it had never been occupied or used for any other purpose, prior to the revolution, nor down to the time it was occupied by the defendant. It further appeared that the four leagues of land in which the town of Victoria is situated were patented by the government of Texas, in December, 1841, to the corporation of Victoria. It further appeared in evidence, that the church used by the Catholics for worship was erected on a lot belonging to the empresario, De Leon; and that no other had ever been used for that purpose, by them, in the town of Victoria. It was admitted that by the constitution of the general government of Mexico, the Roman Catholic was the national religion; and that no other church or denomination of Christians were tolerated in Texas, previous to our revolution.

On the trial, several exceptions were taken to the opinion of the presiding judge, on points of law. We shall, however, only notice the following charges asked by the defendant's counsel, and refused by the judge, i. e.: That, under the laws of Mexico, the church could not hold land in fee simple. That property, of which the church had the usufruct under the Mexican government, did, upon the dissolution of the connection between Mexico and Texas, revert, without office found, to the government of Texas. That by the Texan revolution all laws in force in Mexico, regulating matters and property pertaining to the church, were rendered absolutely null and void.

Before examining the correctness of the decision of the court below in refusing to give the above charges, we will, for the purpose of better understanding the grounds on which the plaintiff rested his claim to the lot in controversy, cite some extracts from the laws of Coahuila and Texas, and an act of the congress of the republic of Texas.

The town of Victoria was laid out and surveyed in accordance with the 34th article of the colonization law of 1825. It is in the following words, i. e.: "Towns shall be founded on such sites as the executive, or the person commissioned by him

for that purpose, shall judge most appropriate; and four square leagues shall be designated for each, whose area may be regular or irregular, as the locality shall require."

The 13th article of the commissioner's instructions [Laws of Coahuila and Texas, p. 72] directs "that the block fronting the principal or constitutional square on the east side shall be destined for a church, curate's dwelling, and other ecclesiastical edifices." At the instance of the Catholic bishop, the congress of the republic of Texas, on the 13th January, 1841, passed an act as follows, i. e.: "That the churches at San Antonio, Goliad, Victoria, the church lot at Nacogdoches, the churches at the Missions of Conception, San José, San Juan Espada, and the Mission of Refugio, with outbuildings and lots, if any, belonging to them, be, and they are hereby acknowledged and declared the property of the present chief pastor of the Roman Catholic church in the republic of Texas, and his successors in office, in trust forever, for the use and benefit of the congregations residing near the same, or who may hereafter reside near the same, for religious purposes and purposes of education, and none other; *provided*, that nothing herein contained shall be so construed as to give title to any lands, except the lots upon which the churches are situated, which shall not exceed fifteen acres." The plaintiff claimed title to the lot sued for, both under the above act of congress and under the laws of Mexico. An inquiry into the last will carry us back to the first charge asked by the defendant on the trial in the court below.

By what tenure, then, did the church hold property under the laws of Mexico, at the date of the revolution that established the independence of Texas? It is believed that, in most of the Catholic countries, the pope, as the head of the church, claims right of property in himself to all the lands, edifices and profits accruing appurtenant to the church, and that the clergy are dependent on him for support; and to enable him to do so, he not only has extensive church domains, but he claims the right, independent of the supreme temporal sovereignty, to levy tithes, and regulate the collection of fees for the various

services of his clergy. It is not important to inquire into the justice of the right of the head of the church to the plenary powers claimed by him. The Protestants would be hard to be convinced that it was by Divine right; but it is sufficient to know that this right, be it founded in religion or in gross fraud, was, nevertheless, universally acquiesced in, at the period of the discovery of our continent, by the greater part of Christendom. He claimed the right of disposing of all the newly discovered countries; and the proudest sovereigns thought it not beneath their royal dignity, to solicit at the hands of his Holiness the boon of annexing to their dominions, countries discovered by the enterprise of their own subjects. Ferdinand and Isabella, the most powerful sovereigns of the age, and the most sagacious that ever reigned in Spain, acknowledged their fealty by accepting an investiture of dominion of the countries discovered by Columbus from the successor of St. Peter; "and Pope Alexander the VI. granted to the crown of Spain the tithes in all the newly discovered countries, on condition that provision should be made for the religious instruction of the natives." Soon after this, Julius II. conferred on Ferdinand and his successors the right of patronage, and the absolute disposal of all ecclesiastical benefices. The pontiffs, unacquainted with the value of what Ferdinand demanded, bestowed these donations with an inconsiderate liberality, which their successors have often lamented, and wished to recall. In consequence of those grants, the Spanish monarchs became, *in effect, the heads of the Catholic church* in their American possessions. In them, the administration of the revenues was vested. Their nominations of persons to supply vacant benefices was instantly supplied by the pope. Thus, in all Spanish America, authority of every species vested in the crown. Then, no collision was known between spiritual and temporal jurisdiction. The king was the only superior; his name alone was heard of, without looking to a dependence on any foreign power. Papal bulls were not recognized as of any force in America, until they had been examined and approved of by the royal council of the Indies; and if any bull was surreptitiously introduced and circulated in

America, without obtaining that approbation, ecclesiastics were required, not only to prevent it from taking effect, but to seize all the copies of it, and to transmit them to the council of the Indies. [Robertson's America, 360, 362; Prescott's Ferdinand and Isabella, 492–3. See, also, Antoines *et al. vs.* Esclava's Heirs, 9 Porter, 527.] When we reflect on the time when these concessions were made, and the abject submission to the supremacy of the holy pontiff, we not only admire the foresight of the king, but we are astonished at the imbecility of the popes, who could yield so easily that supremacy. It was, in their hands, a ready and most efficient means by which to keep the clergy, from their dependent condition, always obedient and submissive to the will, whether for good or evil, of the head of the church; and by renouncing this fealty, the clergy became dependent on the will of the temporal chief in as absolute a degree as they had been to their spiritual head. If the right of church property in other Catholic countries was in the pope, as the head of the church, the same right was in the crown of Spain, in Spanish America, as the head of both temporal and spiritual jurisdiction. The right of property in fee being in the king, as long as his dominion was acknowledged in America, after the revolution was in the Mexican government, as successor to the former sovereign power; the clergy being permitted only to the enjoyment of the use.

The church in Mexico seems to have been entirely under the control of the political authority; so much so, that the ceremonies and religious festivals were regulated by law. [Laws of Coahuila and Texas, decree 42.]

By a decree of the king and cortes of Spain in 1820, churches are prohibited from holding any real or immovable property. In the 14th article of the decree will be found the following provision, i. e.: "The churches, monasteries, convents, and all other ecclesiastical communities, as well secular as regular, charity houses, hospitals, poor houses, schools, confraternities, brotherhoods, commandancies, and every other establishment, whether ecclesiastical or lay, known by the name of mortmains, cannot, from this time, in future, acquire

any real or immovable property, in any province of the monarchy, by testament, donation, purchase, rent charges, infeudation, adjudication of rents, in payment of rents due, nor by any title whatsoever, either lucrative or onerous." [White's Collection, 155.] This decree was in force in Mexico at the revolution, and, after the separation from the mother country, was re-enacted by a law of Mexico. It was recognized and adopted by the congress of Coahuila and Texas in decree No. 263, article 7.

It is doubtful whether the church, as an institution, could have held real estate by fee simple, or perfect title, even before the abolition of mortmain, because from the constitution of the church in the king of Spain's American dominions, the temporal sovereign was essentially the head of the church. True it is, that, as the supreme sovereign, he was bound to furnish the means of supporting the national religion; and this is believed to have been done by the imposition of such tithe duties as to him might seem best calculated to effect the object. This may, too, have been done by appropriating the rents and profits arising from the use of a portion of his domain, or from any other source of revenue that he might ordain. The case of Antoines *et al. vs.* The Heirs of Esclava, in 9 Porter, 527, was a suit brought by the complainants, as trustees of the Catholic church in Mobile, to recover a lot of ground in the city. The report of the case shows that the lot in controversy had been sold and conveyed to the king of Spain, then the sovereign of the country, for the express purpose of erecting on it a curate's dwelling and a church. The buildings were erected and used for that purpose for several years, when it became necessary to repair them. On the petition to the king's government from the curate, that the repairs should be made, or, if thought expedient, the property should be sold, a sale was made by the intendant, and the ancestor of the defendants became the purchaser. The court sustained the title of the purchaser. It is true, that, in that case, the deed to the king, although it expressed that it was for the purpose of building the curate's house and a church, it also contained a clause that he might sell or alien it at his sovereign will and pleasure, and

it was in proof that the purchase money was paid from the royal coffers; yet the petition of the curate for repairs, or a sale, shows that the church was dependent on the crown for a support. · On the trial, it appeared, from the evidence, that the "church could levy no tithes; that its ministers were made stipendiaries of the crown, from whose treasury they received an annual salary, and had, besides that, no source of revenue, except their fees on marriages, christenings, etc."

The fact that the act of congress of the republic of Texas, granting the property in certain churches, church lots and missions to the Catholic church, before cited, being at the instance of the bishop, is a strong presumption that, without such action of the government, the church could not hold such property by perfect title. The congress of the state of Coahuila and Texas seems to have acted as though there was no restraint upon the state's resuming the control of property that had been dedicated to the use of the missions; and, by decree 177, it is authorized and directed to alienate the lands that pertained to the extinguished missions, conforming in so doing to the colonization law of March 24, 1825. "The town property, or securities that pertained to said missions, shall be sold at public auction according to law." That this was done, the archives of the general land office clearly show.

The result of our examination, so far as our very limited means afford us the opportunity, is that the church, at the period of our revolution, held no real estate by perfect title; that it only enjoyed and held the usufruct interest in such land as it possessed. There can be no doubt, it is believed, that by the successful revolution the republic of Texas become possessed of the right and title to all the land, or public domain, that belonged to the government of Mexico at the date of the revolution, by as full and perfect title as was vested in that government, or in the government of Coahuila and Texas.

We will next inquire what effect the revolution that separated Texas from Mexico had on such real property in which the usufruct interest was enjoyed by the church; for, by the appellant's counsel, it is contended that by the mere act of a change of sovereignty all such tenures were dissolved and be-

came absolutely void. This conclusion is believed not to be sustainable on the sound principles of the liberal and enlightened jurisprudence of the present age. Modern jurists, in this country and in Europe, have harmonized with the progress of public sentiment so far, as almost to have built up an improved international code, one of the maxims of which is, so to construe rights of persons and communities as to cause the least possible injury to result from revolutions or changes in the form of government; whether such changes be brought about peaceably by an expression of the will of the inherent right of the people, or forcibly, by a resort to arms. A conquering general overruns, and reduces to subjection a province of (or the whole of) a neighboring independent government. What is to be the course he will adopt for the government of the conquered people? Is he to destroy at once all municipal law, all their rights of property, their customs and religion? The more expanded sentiments of humanity would furnish an answer in the negative; and would declare that it is his duty to abridge rights and privileges no further than necessity, and a prudent regard to the preservation of his conquest, would dictate. When an integral part of a government, by a successful revolution, establishes its independence, are rights of every description to be less regarded than if the people had been subjugated by a foreign invader? Such a conclusion would be too preposterous to be for a moment thought of; nor is it believed that the principles we have been discussing could lead to any embarrassing or pernicious results to the new government. True it is, that, if the right claimed was held at the will of the former sovereignty, it would in like manner be held at the will of the new one — the tenure would be the same; the relation between the tenant and the lord of the fee would be unchanged.

If it is inconsistent with the policy or the interest of the new sovereignty to permit the further enjoyment of the right, it can be terminated by his resuming the possession. That, in some instances, it would be found expedient to resume the right, can be readily conceived, if the institution, in the enjoyment of the use and profits of the land, should be incompatible with the principles of the new government; or if the amount of the

domain, from its extent, would operate prejudicially. It would, in such cases, be not only strictly just, but would also become the duty of the new government, to put an end to its longer continuance. What we wish, however, to establish is, that until some affirmative act, the tenant in actual possession, susceptible of definite proof, will have rights of a character to be protected in our courts. The foregoing views render it unnecessary to notice the other point presented by the bill of exceptions. The plaintiff in the court below failed to establish any right to the property sued for; not even a tenancy at will, such as we have described. The evidence shows that it was designated on the map of the town of Victoria as the ecclesiastical square; but that it never had been occupied or used for any purpose whatever, connected with the church. However, from the law cited, showing in what manner the colonial towns should be laid out, and directing that the square corresponding with this should be destined for a church, a curate's house, and other ecclesiastical edifices, there can be no doubt that if it had been occupied for that purpose, or for any purpose connected therewith, that it would have been the accomplishment of its destiny, and would have constituted a dedication entitled to the protection of the law. But, until it was in some way occupied or used, there was no tenancy. The cases of dedication to which we have been referred have been carefully examined, and they seem to settle the following principles: That, to sustain an action for the property dedicated, the plaintiff must show legal title; or he must show a possession of the use, and a deprivation thereof. In the case of Terrett *et al. vs.* Taylor *et al.* [9 Cranch, 43], a complete title was made out in the trustees, for the use of the church. In the case of the Society for Propagating the Gospel in Foreign Parts *vs.* The Town of Paulet and Clark, a good title was shown, and the plaintiffs recovered on the strength of their title. [4 Peters, 480.] In the case of Inglis *vs.* The Trustees of the Sailors' Snug Harbor [3 Peters, 101], the trustees made out a complete legal title to the dedicated property. The case of the City of Cincinnati *vs.* White [6 Peters, 431], was

that of the dedication of a piece of ground, between Front street and the river, to public use; the city showed no title in fee, but it had been long used as a common thoroughfare, on which thousands daily passed and repassed, and costly buildings were erected adjacent to it. The city sustained the dedication on the ground, mainly, of possession of the use.

Before quitting the subject of dedication, let us again, for a moment, consider the pretension of the plaintiff below to the property in question, on the ground of its having been destined by law to ecclesiastical purposes. There can be no doubt of the fact that it was so destined, and there is as little doubt that the same system of law destined every owner of a lot, and every parishioner, to a contribution, by various names, to the erection of the contemplated edifice, and the support of the Roman Catholic clergy, who administered therein the ceremonies of their religion, and of no others. Had the same system remained unchanged, the obligation of the one would have been as strong as the other. The entire inhabitants of the city and parish would have been compelled to have paid their contributions. It would have been, essentially, a Roman Catholic community, to the entire exclusion of all other denominations whatever. But the revolution, and the constitution formed by the people as the fundamental system of the new government, materially affected these pretensions of the church, and with justice and humanity resolved, that, as man is an accountable being, he should be permitted to worship his maker according to the dictates of his own conscience. The third article of the Declaration of Rights is, that " *No preference shall be given by law to any religious denomination or mode of worship, over another; but every person shall be permitted to worship God according to the dictates of his own conscience.*" This declaration reduced the Roman Catholic church from the high privilege of being the only national church, to a level and an equality with every other denomination of religion. After this important change, and in the face of this assertion of a fundamental principle, it could not for a moment be contended that assessments and contributions could

be levied, for the purpose of erecting church edifices, and for the support of the ecclesiastics, on the ground that the previous system had destined such contributions.   Yet all these legal guaranties might be enforced, with the same reasons as a right to property in which the church had no absolute title; had never used and enjoyed it, in any manner whatever; merely because it had been destined, before the change of the system of government, that the use should be appropriated to that purpose.

In protecting the church in the use, and in the undisturbed enjoyment, of such property as had been actually so possessed and enjoyed at the date of the revolution, we are doing the very utmost that the spirit of the constitution will permit.   To concede more, would be to tolerate the assertion of pretensions that would be wholly repugnant to that equality guarantied to all religious denominations.

It only remains to inquire, if the plaintiff below acquired any title by the act of congress of the 13th of January, 1841, heretofore cited.   A reference to the act, it is believed, will clearly show that it does not include the property in controversy.   It grants the church at San Antonio, Goliad and Victoria; clearly meaning the edifices, and cannot mean the lot in controversy, on which there was no edifice of any kind whatever, nor was it connected with such edifice.   This will appear more manifest from the fact that the church lot at Nacogdoches is named, and not the church, in the same act.   Perhaps the legislative grant may have been made from the supposition that the lot in question had been so occupied; but whatever may have been the opinion of the law-makers, the church edifice, if any, was granted.

But the proviso at the close of the act places the matter beyond controversy.   It is " that nothing herein contained shall be so construed as to give title to any land, except the lots upon which the churches are situated, which shall not exceed fifteen acres."

The judgment is reversed, and cause dismissed.

A rehearing having been granted in this cause, the same

was argued at this term of court, by HOWARD for the appellee, who contended:

That the Catholic church, under the law of Coahuila and Texas, had a legislative grant for the block fronting the principal square, upon the "east side" of all new towns, which the 13th article of instructions to commissioners [p. 72, Decrees of Coahuila and Texas, 72] declares, "shall be destined for a church, curate's dwelling, and other ecclesiastical edifices." This was a legal appropriation of the land by exact designation. It set apart a particular square in the town survey. No further title was contemplated; no patent or *testimonio* was contemplated, or ever issued. The law was a dedication and conveyance *in presenti* of this particular square, in every new town. The foregoing instructions are a legislative decree, although issued from the executive office apparently, according to the translation. which is wrong. They were first adopted by congress, and further, recognized by decree No. 128.

If there had been no other title but this, there can be but little doubt that the title would have been completely vested in the church. It was not only good as a legislative grant, but if the *instructions* had proceeded from the executive, it would still have been a good grant, as the executive had a right to concede the public lands; but there is no doubt that these instructions proceeded from the congress.

A patent, or *testimonio*, is not the title, but only evidence that the *law* which vests the title has been complied with. [5 Porter, 245; 1 Scammon, McConnel *vs.* Wilcox.] There can be no doubt that a legislative grant is good. [Fulton *vs.* McAfee, 5 Howard's Miss. R. 760.] And no particular form or words are necessary in such grant. [5 New Hampshire Reps. 280; 2 How. U. S. R. 319; 3 Story Constitution, 256; also State of New Jersey *vs.* Wilson, 7 Cr. 2 Pet. Cond. 457; especially Allen *vs.* Parish, 1 Ohio Cond. 492; 10 Smedes & Marshall, 460.]

It was also sufficiently certain, both by the civil and common law. [See Story's Eq. Tit. Charities; Vidal *vs.* Girard's Ex'rs, 2 How. U. S. R. 127, and note 155.]

A legislative grant vests an actual seizin [8 New Hampshire Reps. 512], and therefore no actual possession was necessary.

Again, the grant is good as a dedication to a public and pious use; not only the church, as a community, had a right to insist upon it, but all the inhabitants of the town. A settlement of the town, after the survey, was sufficient possession of the dedication, for *all* were interested in it. Indeed, no possession was necessary, because it rests on the principle of immediate dedication in grant. [Wyman *vs.* The Mayor, 11 Wend. 487; 8 id. 89; 2 id. 472.]

It is said that in Spain the king was the head of the church, and the title to the church property vested in him. Admitting that such was the case, and the title devolved upon the republic of Mexico, as to all previous grants, it could not have that effect as to property subsequently granted to the church by the federation or a state. By title 1, article 3 of the constitution of '24, the Catholic religion is made the religion of the state; the exercise of any other prohibited. It was, therefore, a power in the state. The provisions of the state constitution are similar. [Laws C. and T. p. 314, articles 9 and 10.]

The Mexican government has always respected the property of the church. It has never treated it as accruing to the new government by force of the revolution. Even in secularizing the missions, the church edifices and lots were expressly reserved both by the laws of Spain and Mexico.

Again, the very act of the congress [vol. 6, p. 15] which authorizes the patent to Victoria, makes not only a reservation of all previous grants, but declares the survey of the town, as made by the commissioner and surveyor, valid. On this survey, the lot in controversy was set apart for the Catholic church. The act expressly confirms the plan of the town as laid out by De Leon, and is for that reason a legislative grant. It is contended that the act of 1841 conveyed this lot to the church. If it did not pass as the lot on which the church was situated, it passed as an "out-lot," as mentioned in the act. It was evi-

dently the intention to pass that lot which, under former laws, had been granted to the church.

The patent was not sent up in the record, and we are bound to presume it contained an actual reservation of the church lot. The law makes the town survey a part of the patent, as much as though embodied in it. It is a fair construction, that the legislature intended to grant the lot in controversy; and if so, no mere description will defeat that intent. [2 vol. Sup. U. S. Digest, 808, articles 20, 26, 37, 57.]

We deny that the king of Spain was the head of the church, in such a sense as to vest in him the title to church property. In the case of Antoines vs. Esclava, 9 Porter, 527, the land was purchased with the royal funds, with an express right in the title to dispose of the property, reserved to the king. If, by the general law, he had such a right, why was it specially inserted in this title? Law 19, Tit. 2, Lib. 1, of the Indies, expressly negatives such an idea. It is declared by Liber 3, Tit. 5, law 1, of the Novissima Recopalacion, that what the king gives to any one, neither the king nor any one else can take away. [2 White, 99.]

Law 15, Tit. 5, P. 5, declares that things sacred cannot be sold [article 11, Lib. 2, Tit. 10], including all church property. Neither under the common law, or law of Spain, could the crown resume property which it had once granted to the church. A grant to the church as a community was not a grant to the crown. [Terrett vs. Taylor, 9 Cranch, 254; 3 Pet. Cond. 254.]

NOTE.— The foregoing opinion was delivered at the last term of the court, and the judgment of the court was then rendered; but on the petition of the appellee, a rehearing was granted, and it was argued this term by the appellee. After hearing the same, the court adheres to the opinion delivered at the last term.                                                    LIPSCOMB.